# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 07-2716

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | District of Minnesota. |
| Larry Darnell Williams, | * | |
| | * | |
| Appellant. | * | |

_____

Submitted: April 17, 2008
Filed: April 15, 2009

_____

Before MURPHY, COLLOTON, and SHEPHERD, Circuit Judges.

_____

COLLOTON, Circuit Judge.

A jury convicted Larry Darnell Williams of two counts of possession of cocaine base with intent to distribute, one count of conspiracy to possess and distribute fifty grams or more of cocaine base, and one count of unlawful possession of a firearm as a previously convicted felon. The district court[1] sentenced Williams to 360 months' imprisonment. He appeals his conviction, alleging that he was denied effective assistance of counsel, and his sentence, alleging that it is unreasonable. We affirm.

_____

[1]The Honorable Michael J. Davis, Chief United States District Judge for the District of Minnesota.

I.

According to testimony at trial, Williams was arrested on January 17, 2004, after fleeing a parking lot where officers heard gunshots. Officers brought Williams to the Hennepin County Jail and discovered 1.95 grams of cocaine base, commonly know as "crack cocaine," in his pants pocket. Williams was released, and on May 19, 2004, officers received a tip that Williams was in a bar wearing a bulletproof vest. When officers approached Williams, he fled, at first in his car, and then later on foot. During the chase, Williams was carrying a clear plastic bag. At the time of his arrest, he no longer had the bag, but a bag was discovered in a location where Williams had stopped and leaned down during the chase. The bag contained nineteen individually wrapped rocks of crack. On July 9, 2004, a Buick Riviera shared by Williams and his girlfriend, Nunziata Williams, was repossessed while they were at a St. Paul nightclub. The repossession company discovered a .45 caliber handgun with a laser sight in the car. Nunziata testified that the gun belonged to Williams, and that he often carried it with him.

A federal grand jury first charged Williams in July 2004, and the case proceeded to trial on a second superseding indictment filed in February 2005. The indictment included seven counts: (1) conspiracy to possess and distribute crack cocaine, (2) possession of crack cocaine with intent to distribute on January 17, 2004, (3) possession of crack cocaine with intent to distribute on May 19, 2004, (4) possession of a firearm in furtherance of a drug trafficking crime on January 17, 2004, (5) unlawful possession of a firearm as a previously convicted felon on January 17, 2004, (6) possession of a firearm in furtherance of a drug trafficking crime from March to July 2004, and (7) unlawful possession of a firearm as a previously convicted felon from March to July 2004. On March 10, 2005, on motion of the government, the court dismissed Counts 4 and 5, pertaining to the possession of a firearm on January 17, 2004. The government explained that it sought to dismiss the

charges in light of "[i]nvestigation conducted subsequent to the return of" the February indictment.

Williams retained private counsel, Calandra Harris. On December 10, 2004, before the government had moved to dismiss the firearms charges relating to January 17, 2004, Harris spoke with her client by telephone. Williams and Harris discussed a potential defense witness, Quinn Tucker. Tucker, who also was a client of Harris, had informed Harris that he had fired the shots that attracted the attention of police on January 17.

Trial began on March 10, 2005. Harris informed the district court that Williams had just given her a list of witnesses, including Tucker, whom he wished to call. Harris informed the court that she did not think Tucker would be "beneficial" to Williams's case, and that calling Tucker would create a potential conflict of interest because she represented Tucker as well. The court ruled that Harris could not call Tucker "as that name was just given to you an hour ago and was not supplied to the Government in appropriate fashion under the rules and, more importantly, this is a client that you're representing that would cause a conflict."

After two days of trial, Williams asked to represent himself. The district court warned Williams extensively about the dangers of self-representation, and asked him to consult with Harris and reconsider his decision. After doing so, Williams repeated his request, and the court granted it. The court gave Williams the opportunity to present all the defense witnesses he wanted, directing the government to find those who also appeared on the government's witness list and instructing Williams to have his private investigator find any others, including Quinn Tucker. Williams called five witnesses, but not Tucker, before resting his case. The jury convicted Williams on four out of the five charges, acquitting him on the charge of possessing a firearm in furtherance of a drug trafficking crime.

Williams moved for a new trial on the basis of ineffective assistance of counsel, alleging that Harris failed to interview or call three witnesses – Quinn Tucker, Travis Mitchell, and Williams's brother, Mario – and that Williams's decision to proceed *pro se* was not voluntary. The court denied this motion, finding that Williams's waiver of his right to counsel was voluntary, that Harris provided effective assistance, and that, in any event, there was no prejudice from Harris's failure to call the additional witnesses. The court sentenced Williams to 360 months' imprisonment, the bottom of the advisory guideline range.

## II.

Williams argues that the district court should have granted his motion for a new trial on the ground that he was deprived of the effective assistance of counsel. Williams argues that Harris's performance as counsel was deficient and prejudicial because she did not interview or call three witnesses: Quinn Tucker, Travis Mitchell, and Williams's brother, Mario. To establish ineffective assistance of counsel, Williams must show that Harris's performance fell below an objective standard of reasonable competence and that this performance prejudiced him. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). We will consider this claim on direct appeal, because the record has been fully developed, *see United States v. Rice*, 449 F.3d 887, 897 (8th Cir. 2006), and we review the court's denial of the motion for new trial under an abuse of discretion standard. *United States v. Villalpando*, 259 F.3d 934, 938 (8th Cir. 2001).

As to Tucker, we agree with the district court that Williams did not establish that Harris's failure to interview or call Tucker as a witness was objectively unreasonable, or that Williams suffered prejudice. Williams asserts that Tucker would have testified at trial that he, and not Williams, fired shots in the air on January 17, 2004, before police responded to the scene and arrested Williams. This assumption is not borne out by Tucker's testimony at a post-trial evidentiary hearing, but even if

it were correct, the evidence posited by Williams does not create a reasonable probability that he would have been acquitted. The evidence of shots fired on January 17 was offered only to show why police responded to the scene. Williams was not tried on an offense involving possession of a firearm on January 17, and the uncontradicted testimony at trial was that Williams possessed no weapon when he was arrested. Thus, it was an objectively reasonable decision to refrain from further interviewing or calling a witness who had no probative evidence to offer, and Williams suffered no prejudice.

We reject Williams's contention that prejudice should be presumed because Harris labored under a conflict of interest. Even assuming that a presumption of prejudice might apply in these circumstances, *see Winfield v. Roper*, 460 F.3d 1026, 1039 (8th Cir. 2006), Williams has not identified a plausible alternative defense strategy or tactic that Harris might have pursued, because Tucker had no probative evidence to offer.

Williams also claims that Harris was ineffective for failing to interview or call Travis Mitchell. Williams asserts that Mitchell would have testified that Williams had been thoroughly searched at the time of his arrest on January 17 arrest, and that such testimony would have supported a defense theory that police planted crack cocaine in his possession so that it could be discovered when he was booked at the jail. Harris's decision not to interview Mitchell must be examined based on the information available to her at the time it was made. *Parker v. Bowersox*, 94 F.3d 458, 461 (8th Cir. 1996). The district court credited Harris's testimony that when she assumed representation of Williams, a private investigator hired by Williams's previous attorney advised Harris that the investigator had attempted to interview Mitchell, but that Mitchell had refused to give a statement. Particularly given that police reports of the incident did not establish specifically that Mitchell had witnessed a search of Williams, and that Williams had not alleged to Harris that the crack cocaine was planted in his possession by police, it was objectively reasonable for Harris to refrain

from making a second attempt to interview a witness who had been approached already by the defense team. Williams also failed to call Mitchell as a witness at the post-trial evidentiary hearing to establish what Mitchell's testimony at trial might have been, and we thus see no error in the district court's conclusion that Williams also failed to demonstrate prejudice.

In his final contention regarding additional witnesses, Williams asserts that his brother Mario could have testified that on the date that the Buick Riviera was repossessed, Williams was not present when the car was driven to the club where it was seized. According to Williams, this testimony would have supported an inference that Williams had not been in the car that night, and that he had not possessed the firearm that was found in the vehicle after it was repossessed. We agree with the district court that Williams has not established deficient performance or prejudice. Nothing in the record shows that Harris should have known to interview Mario. Williams never told Harris that Mario had driven the Riviera on the night in question or that the firearm in the car belonged to Mario. To the contrary, Williams told Harris that the firearm belonged to Williams. Williams also did not mention Mario as a potential witness until the first day of trial. At the post-trial evidentiary hearing, Mario invoked the Fifth Amendment when asked about the relevant events, and Williams has thus failed to demonstrate that Mario would have given favorable testimony, or that Williams suffered prejudice from Harris's failure to interview and call Mario as a witness at trial.

We also are not persuaded by Williams's arguments that Harris's representation was ineffective because she did not spend enough time with him before trial, and that the relationship between attorney and client broke down so completely that ineffectiveness of counsel should be presumed. The district court found that Harris and Williams "were in frequent contact, though [*sic*] brief telephone conversations, until the last few weeks before trial," and Williams has not demonstrated how further communications would have resulted in alternate strategies or lines of investigation

that would have created a reasonable probability of a different outcome at trial. *See Strickland*, 466 U.S. at 694. The district court concluded, based on its observation of trial, that Harris had represented Williams in an "able and professional" manner. While there was evident tension between Harris and Williams, the Sixth Amendment does not guarantee a "meaningful relationship" between attorney and client, *see Morris v. Slappy*, 461 U.S. 1, 13-14 (1983), and we reject Williams's argument that his mistrust of Harris made her representation constitutionally ineffective.

Finally, Williams argues that his decision to represent himself for part of the trial was not voluntary because he was faced with the Hobson's choice of proceeding with ineffective counsel or no counsel at all. We have concluded, however, that Harris was not ineffective, and a district court may properly require the defendant to choose between adequate representation (though not by the defendant's counsel of choice) and self-representation. *United States v. Mentzos*, 462 F.3d 830, 839 (8th Cir. 2006). Williams's claim that his waiver was involuntary is therefore unavailing.

III.

Williams also challenges his sentence, arguing that the district court did not adequately consider his arguments for a downward variance. Williams contends that the court should have addressed more fully his arguments that a difference of only two grams of crack cocaine would have reduced his advisory guideline range significantly, and that he is "barely a career offender."

We conclude that the district court adequately considered Williams's arguments for a variance, and adequately stated its reasons for the sentence it imposed. Where, as here, the court elects to sentence within the advisory guideline range, its decision "will not necessarily require lengthy explanation," because "[c]ircumstances may well make clear that the judge rests his decision upon the Commission's own reasoning that the Guidelines sentence is a proper sentence (in terms of § 3[5]53(a) and other

congressional mandates) in the typical case." *Rita v. United States*, 127 S. Ct. 2456, 2468 (2007). The district court here explained that it had considered Williams's sentencing memorandum, which set forth Williams's contentions in mitigation of punishment, but nonetheless decided to sentence Williams within the advisory range. We are satisfied that the district court adequately considered Williams's arguments. *See United States v. Sigala*, 521 F.3d 849, 851-52 (8th Cir. 2008). We further conclude that the district court's statement of reasons for its judgment, which cited Williams's "serious, violent, and copious criminal history" as well as the seriousness of the instant crimes, sufficiently explained the reasons for its chosen sentence.

\* \* \*

For these reasons, the judgment of the district court is affirmed.

_____